TCA BUILDING COMPANY, INC., Appellant,

v.

NORTHWESTERN RESOURCES COMPANY, et al., Appellees.

No. 10–94–317–CV.

Court of Appeals of Texas, Waco.

Dec. 7, 1994.

Rehearing Overruled Jan. 4, 1995.

G. Allen Price, Michael A. McLaughlin, Houston, for appellant.

Shannon H. Ratliff, C. Morris Davis, Don H. Magee & Karen L. Watkins, McGinnis, Lochridge & Kilgore, L.L.P., Austin, James N. Parsons, Parsons & Thorn, Palestine, for appellees.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

THOMAS, Chief Justice.

This is an accelerated appeal of an order denying a temporary injunction. *See* TEX. R.APP.P. 42(a)(1). Northwestern Resources Company (Northwestern) operates the Jewett Mine that supplies lignite fuel for Houston Lighting & Power Company's (HL & P) power generating plant in Limestone County. TCA Building Company, Inc. (TCA) owns a 107–acre tract in Freestone County that lies within the boundaries of the Jewett Mine. TCA sought the temporary injunction to prohibit Northwestern and HL & P from placing "spoil"[1] on TCA's property, pending a final determination in the 87th District Court of Freestone County of TCA's suit against Northwestern and HL & P for a declaratory judgment, fraud in a real estate transaction, and injunctive relief. Although the court had originally granted a temporary restraining order, it dissolved the restraining order and denied the temporary injunction after a hearing. We will affirm.

## BACKGROUND

When TCA purchased the 107–acre tract on September 20, 1991, Northwestern held two 1978 coal and lignite leases covering the property and had already stripped the topsoil and approximately sixty feet of overburden[2] from a part of the tract. TCA's property lies within the boundary of Northwestern's mining permit from the Texas Railroad Commission. After a dispute arose over the leases' validity, TCA sued Northwestern in the 87th District Court in Freestone County (No. 91–360–B) to have the leases declared void or, alternatively, to have them set aside on the ground that Northwestern had fraudulently obtained their ratification. On December 10, 1993, prior to a trial on the merits, Northwestern executed and recorded in the deed records a "RELEASE OF EXCLUSIVITY AND LICENSE," in which Northwestern, after reciting that it held two coal leases on TCA's property, declared:

> As permitted by the Coal Leases, Northwestern has determined not to mine lignite from [TCA's] Property, but in conformity with requirements of law and applicable regulation, *Northwestern will conduct reclamation operations on [TCA's] Property.*
>
> .   .   .   .   .
>
> Northwestern hereby releases the exclusivity of its rights and estate under the Coal Leases so that TCA, its successors and assigns, shall have a right, subject to applicable law and regulation, to mine, market and sell coal from [TCA's] Property *without limiting the right of Northwestern to continue and complete its reclamation and incidental operations on [TCA's] Property pursuant to its rights under the Coal Leases.*

(Emphasis added).

Then, on February 9, 1994, during the trial of the validity of the leases, Northwestern executed and recorded a "SUPPLEMENT TO RELEASE OF EXCLUSIVITY AND LICENSE" for the stated purpose of clarifying and resolving "any questions of intent regarding the purpose and effect of the Release of Exclusivity and License." In the Supplement Northwestern states:

> Northwestern hereby GRANTS, SELLS and CONVEYS all right, title and interest in and to the coal and lignite on and under [TCA's] Property . . . to T.C.A. Addition-

---

1. "Spoil," in the nomenclature of the mining industry, refers to dirt that has been removed during the mining process.

2. "Overburden" refers to dirt removed during the mining process to expose or gain access to, in this instance, lignite for surface mining.

ally, Northwestern hereby releases any and all RIGHT, TITLE and INTEREST to the coal and lignite under [TCA's] Property which it claimed under the Coal Leases, Options and Ratifications....

.   .   .   .   .

*Northwestern acknowledges that it is now obligated to reclaim the T.C.A. Property. Northwestern does not release the Coal Leases, Options or Ratifications because it has a continuing obligation to reclaim [TCA's] Property pursuant to both the Coal Leases and applicable law.*

(Emphasis added).

Based on a jury's verdict, the 87th District Court entered a take-nothing judgment against TCA in its suit against Northwestern and, likewise, entered a take-nothing judgment against Northwestern on its counterclaims and cross-claims against TCA. TCA has perfected an appeal of the judgment in No. 91–360–B, which is now pending on the docket of this court as Cause No. 10–94–282–CV.

On August 8 Northwestern notified TCA in writing that it intended to amend its mining permit from the Railroad Commission to reduce the amount of spoil it could place on TCA's property from 11 million cubic yards, the amount then authorized by its permit, to 2.7 million cubic yards. According to the written notice, this amount of spoil "will be approximately the same amount of dirt on the property as was on the property before Northwestern began its operations." On August 16 TCA sued Northwestern and HL & P in the 87th District Court, seeking a declaratory judgment of the parties' rights under the two coal leases, the Release of Exclusivity and License, and the Supplement to Release of Exclusivity and License. It also alleged other causes of action and requested injunctive relief. The court granted TCA a temporary restraining order prohibiting Northwestern from placing any spoil on TCA's property.

TCA requested that the Railroad Commission revise Northwestern's mining permit to prohibit Northwestern from placing any spoil on TCA's property until TCA was issued its own mining permit.[3] The Commission entered an interim order on September 26 limiting the amount of spoil Northwestern could place on TCA's property "to no more than that which would allow continuation of reclamation to the elevation of the pre-mine overburden and topsoil." On September 29 TCA applied for a permit to mine the lignite on its own property.

On October 14 the court held a hearing on whether the temporary restraining order, which prohibited Northwestern from placing any spoil on TCA's property, should be continued as a temporary injunction. Northwestern contested by a plea in abatement the court's jurisdiction to issue any injunctive relief, essentially arguing that the Texas Surface Coal Mining and Reclamation Act granted the Railroad Commission exclusive jurisdiction to determine whether Northwestern could place spoil on TCA's property. *See* TEX.REV.CIV.STAT.ANN. art. 5920–11 (Vernon Supp.1994). TCA contended that the Commission's interim order, granting Northwestern permission to place only enough spoil to reclaim the property to its pre-mine contour, does not determine the legal right of Northwestern to enter the property to do so and that only a court could determine the legal rights of the parties. The court denied the plea in abatement and continued with the hearing on TCA's application for a temporary injunction.

At the hearing TCA argued that Northwestern lost whatever legal right it had under the coal leases to enter and place spoil on TCA's property when it conveyed the lignite to TCA in the Supplement to Release of Exclusivity and License. Northwestern pointed out, however, that it expressly retained the right and obligation to reclaim TCA's property in the Supplement to the Release. TCA also asserted that, even if Northwestern retained the legal right to enter and reclaim the property, it could not do so until after TCA had an opportunity to mine the lignite. Otherwise, TCA argued, Northwestern's reclamation would defeat the grant of the lignite in the Supplement to the Release.

---

**3.** The record does not reflect when TCA first made the request to the Railroad Commission.

Two witnesses testified at the hearing. James Francis, TCA's consulting mining engineer, testified that

- TCA's profit from mining its lignite could range from $8.8 million to $13.2 million if the property could be mined "as is," *i.e.*, denuded of its topsoil and overburden.
- allowing Northwestern to dump 11 million cubic yards of spoil on the property would physically destroy one of the lignite seams then exposed at the surface, double the original overburden on the tract, and thus destroy the economic feasibility of mining the lignite.
- allowing Northwestern to place just enough spoil on the property to reclaim it to its pre-mine contours, perhaps 1 to 3 million cubic yards, would also destroy an exposed lignite seam and would damage the property by silt and water runoff from unspread spoil.
- if Northwestern is allowed to reclaim the property to its pre-mine contours before TCA mines the lignite, then TCA would have to remove the topsoil and overburden at its expense, which might affect the property's economic viability.
- it would take 700,000 cubic yards of topsoil and 900,000 cubic yards of overburden to reclaim the property to its pre-mine contours.
- the conveyance of the lignite would become "worthless" if TCA had to assume the obligation, after mining the lignite, of reclaiming the property to its original pre-mine contours.

Carroll Embry, Northwestern's vice-president and general manager, testified that

- Northwestern has a "cradle to grave" obligation to reclaim TCA's property to its pre-mine contours, assuming that the Railroad Commission does not relieve it of that obligation or that TCA does not assume the obligation, and its obligation is secured by a performance bond in favor of the Railroad Commission.
- it would take 1.8 million cubic yards of spoil to reclaim TCA's property to its original pre-mine contours and that Northwestern would suffer $4 million damages, through increased costs, if it

were enjoined from reclaiming the property until after it is mined.

At the conclusion of the hearing, the court dissolved the temporary restraining order and denied TCA's application for a temporary injunction. As already noted, TCA perfected an accelerated appeal of the order denying the temporary injunction. Upon TCA's motion, this appellate court temporarily enjoined Northwestern from placing any spoil on TCA's property, pending a final determination of the accelerated appeal, and ordered TCA to post a bond to protect Northwestern's interests. *See* TEX.R.APP.P. 43(c).

## JURISDICTION

■ Northwestern attacked the trial court's jurisdiction by a plea in abatement, which was denied. It argues on appeal that the dispute between the parties is really about the *timing* of reclamation—*i.e.*, should Northwestern's reclamation take place before or after TCA mines the lignite—rather than whether Northwestern has the legal duty to reclaim. Thus, Northwestern asserts that the Railroad Commission has exclusive jurisdiction to make that operational decision. TCA, however, insists that the issue is whether Northwestern has any legal right to enter its property to dump spoil. That issue, according to TCA, is outside the Commission's jurisdiction.

Section 4(a) of the Texas Surface Coal Mining and Reclamation Act expressly grants the Railroad Commission exclusive jurisdiction over "all surface coal mining and reclamation operations." TEX.REV.CIV.STAT. ANN. art. 5920–11, § 4(a). However, the legislature also expressly provided that "nothing in this Act shall be construed to authorize the commission to adjudicate property rights disputes." *Id.* art. 5920–11, § 21(b)(6)(C). That Northwestern's permit from the Commission authorizes it to place no more spoil on TCA's property "than that which would allow continuation of reclamation to the elevation of the pre-mine overburden and topsoil" does not determine whether Northwestern has the legal right to enter TCA's property to do so. *See Magnolia Petroleum Co. v. Railroad Commission,* 141 Tex. 96, 170

S.W.2d 189, 191 (1943). What is at issue in the trial court is the parties' legal rights under the coal leases, the Release, and Supplement to the Release, as those rights relate to Northwestern's legal right to enter TCA's property to conduct reclamation operations. At issue here is TCA's right to injunctive relief to preclude such entry until the merits of the declaratory judgment and suit for damages are determined.

These questions are not only "inherently judicial in nature," but the Commission is powerless to grant the relief sought by TCA. *See Amarillo Oil v. Energy-Agri Products,* 794 S.W.2d 20, 26 (Tex.1990). Under these circumstances, the trial court has jurisdiction over the merits of TCA's suit and questions relating to injunctive relief, even though the Commission—as Northwestern argues— might have exclusive jurisdiction over matters involving the timing of reclamation operations and how much spoil is required to reclaim the land to its pre-mine contours.[4] *See id.*

### TEMPORARY INJUNCTION

 To obtain a temporary injunction, TCA had to show a probable right of recovery in a trial on the merits and a probable injury in the interim. *See Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993). The question on appeal is whether the court clearly abused its discretion in denying a temporary injunction. *See id.* at 58. An element in determining an abuse of discretion is the existence of an adequate remedy at law. *Harris Cty. v. Gordon,* 616 S.W.2d 167, 168 (Tex.1981). A legal remedy is not adequate, however, unless it provides the injured party relief that is clear, full, practical, and efficient. *Brazos R. Conservation & Reclamation Dist. v. Allen,* 141 Tex. 208, 171 S.W.2d 842, 846 (1943).

The Texas Surface Coal Mining and Reclamation Act requires every permittee to maintain public liability insurance coverage during the term of the permit, its renewal, and reclamation activities, which must pro-

vide protection against personal injury and property damages resulting from surface coal mining and reclamation operations. *See* Tex. Rev.Civ.Stat.Ann. art. 5920-11, § 24. Moreover, any person whose property is injured or damaged through the violation of any rule, regulation or permit issued under the Act can sue for damages. *Id.* art. 5920-11, § 31(g). Thus, TCA has a legal remedy under the Act, as well as at common law. A right to recover damages can, however, be an inadequate remedy under certain circumstances. *Walling,* 863 S.W.2d at 58 (citing *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir.1984)). Situations in which damages alone do not provide an adequate remedy include: (1) the damage award may come too late to save the applicant's business; (2) the applicant needs the income stream from the protected activity to finance the lawsuit; (3) there is a danger that the respondent may become insolvent before a judgment can be rendered and collected; or (4) because of the nature of the applicant's loss, the damages may be very difficult to calculate. *Roland Machinery,* 749 F.2d at 386.

The record does not contain any evidence that would make any of the situations described in *Roland Machinery* applicable. Accordingly, based on the record before it, the court could have reasonably concluded that TCA failed to establish that it does not have an adequate remedy by damages. Because the court could have reasonably concluded that TCA has an adequate remedy at law, it did not abuse its discretion by denying the application for a temporary injunction. *See Walling,* 863 S.W.2d at 57–58.

### DISPOSITION

We overrule TCA's sole point of error and affirm the order denying the temporary injunction. The temporary injunctive relief granted by this court on October 21, 1994, is dissolved.

---

4. We expressly do not decide whether the Texas Railroad Commission's exclusive jurisdiction over "all surface coal mining and reclamation operations" extends to determining whether

Northwestern can reclaim the property before TCA can mine the lignite. *See* Tex.Rev.Civ.Stat. Ann. art. 5920-11, § 4(a) (Vernon Supp.1994).