# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-05-00273-CV
---

**Appellant, RenewData Corporation//Cross Appellant, Shawn Strickler**

**v.**

**Appellee, Shawn Strickler//Cross-Appellee, RenewData Corporation**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO.GN400288, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

This appeal involves an employee's post-termination obligations to a former employer under a covenant not to compete and nondisclosure agreement. Appellant/cross-appellee RenewData Corporation sued its former employee, appellee/cross-appellant Shawn Strickler, after Strickler began working for one of Renew's competitors. Renew claimed that Strickler breached a Proprietary Information and Inventions Agreement, tortiously interfered with Renew's prospective business relationship with a potential customer, and failed to comply with his post-termination fiduciary duty to Renew. After a jury trial, the court entered judgment in favor of Renew. For the reasons discussed below, we affirm the district court's judgment.

## BACKGROUND

Testimony at trial showed that Renew provides various electronic evidence services—including electronic evidence production, consulting, expert witness services, and forensic work such as finding missing e-mail—for entities that are involved in investigations or litigation requiring large-scale production of information. Renew's usual customers are corporations seeking to respond to governmental agencies' subpoenas and law firms involved in the discovery phase of litigation. These customers' typical problem is the inability to retrieve data stored on their computer servers' backup tapes because the computer equipment (hardware) or the programs that saved the data (software) have changed. The unique configuration of hardware and software is called the "native environment." Renew has the technology to extract archived data from the servers' backup tapes without the delay and expense of re-creating the native environment for the information. Renew's chief executive officer, Robert Gomes, testified that Renew, Kroll Ontrack, and eMag are "the only companies" that have their own technology to extract data without restoring the native environment.

Shawn Strickler began working for Renew as its director of corporate sales services on April 21, 2003. Strickler's job required him to attempt to sell Renew's services to entities with a specific need for Renew's services, or "opportunities." The opportunities were identified on an internal list created by Renew's telemarketers, called a "pipeline document." The pipeline document identified opportunities by name, date, dollar amount, and status of their interest or project. Renew also monitored its potential customers with a Web-based tool, accessible to authorized employees, called "SalesForce.com."

Six days before Strickler started his job, Renew's counsel sent a Proprietary Information and Inventions Agreement to Strickler by e-mail. The Agreement contained a covenant not to compete for one year, a nondisclosure agreement, and promises that, upon separation from employment with Renew, the employee will not solicit Renew's clients and will return Renew's company documents.

In his e-mail, Renew's counsel stated that he wanted to be sure Strickler had a chance to read the Agreement before signing it. Strickler responded by requesting the creation of a Renew e-mail account and asking that the Agreement be sent to his new e-mail address so that he could print and sign it the following week. Strickler's job offer was contingent upon signing the Agreement, and he signed it on April 21, 2003, initialing the bottom of each page. On his first day at Renew and after signing the Agreement, Strickler began his training on the process of the electronic evidence business, received the pipeline of prospective customers, and obtained a password to access SalesForce.com.

On November 14, 2003, Renew terminated Strickler, who was an at-will employee. Under the terms of Strickler's Agreement with Renew, the covenant not to compete would be effective until November 14, 2004.

Strickler sent an e-mail to Brendan Sullivan, the chief executive officer of eMag Solutions, Inc., a competitor of Renew's, on November 17, 2003, with a subject line stating "employment opportunity request from Shawn Strickler at Renew Data." Strickler wrote:

> My name is Shawn Strickler and up until last Friday evening I was the Director of Corporate Sales at Renew Data. Several weeks back I was made aware of your recent meeting with Bob and Bonnie Gomes, CEO and Dir. of Partnerships at Renew Data,

respectively, to discuss complementing (and learn competing) technologies. Based on their feedback from that meeting your name was the first that came to mind when determining employment opportunities to explore. I would appreciate the opportunity to discuss my qualifications with you and to determine if eMag could benefit from my knowledge and skills.

If there is a potential interest on your part I will be happy to discuss with you the reason for my departure, but given the potential relationship between your company and Renew Data I would prefer not to unnecessarily have the discussion.

I can be reached on my mobile phone at . . ., or at this e-mail address, and will gladly send over my resume upon request. I look forward to speaking with you soon.

Although Strickler had never met him, Sullivan replied by e-mail the same day, stating that he "was interested in a chat." On November 26, 2003, Strickler called his former supervisor, Gomes, to ask whether he "minded" if Strickler went to work for an unspecified partner of Renew's and whether Gomes might waive his Agreement. Gomes did not give a waiver to Strickler during their telephone conversation, nor did Gomes provide any written waiver to Strickler.

During pre-employment negotiations, Strickler told eMag that he believed he could bring in $1 million of business during his first year. The company's e-mail response informed Strickler that there was not any cap on his earning potential and emphasized that its goal was for Strickler "to bring in NEW business." On December 22, 2003, eMag sent an employment offer to Strickler which stated that Strickler would be required to sign eMag's confidentiality, noncompetition, and nondisclosure agreement, and that his employment would be predicated upon a "satisfactory completion of references." But Strickler did not execute an agreement with eMag, and eMag did not contact any of Strickler's references.

4

On December 29, 2003, Strickler wrote a letter to Gomes at Renew, stating that he had accepted a position with eMag and would begin work on January 2. Renew's counsel responded two days later and advised Strickler that his employment with eMag—Renew's "direct competition"—before November 14, 2004, would constitute a breach of Strickler's covenant not to compete.

Strickler began working for eMag on January 2, 2004, as director of forensic services. That day, his immediate supervisor, Quintin Gregor, urged him to seek his retained attorney's advice regarding his relationship with Renew and his job at eMag. Gregor also requested that Strickler briefly document his goals and "who the immediate easy money targets are."

During his second week at eMag, Strickler sent an e-mail to DTI, a client he had worked with while at Renew, informing them that he no longer worked for Renew and that he had "joined forces" with eMag. Strickler attached his new contact information, asked DTI to call him to assist with its "opportunities," advised that he was substituting temporarily for Gregor, and stated that he looked forward to working with DTI "once again." Fifteen days later, DTI sent an e-mail to Strickler seeking a price quote for recovery of data from a damaged laptop computer's hard drive. Although Strickler testified that he made this contact with DTI at eMag's request, Sullivan testified that it would be inappropriate for an employee like Strickler, who had worked previously at Renew, to contact someone who had done business with him at his former place of employment.

Also during his second week on the job, Strickler sent an e-mail to Maurice Leibenstern, counsel at Computer Associates, offering eMag's services concerning a pending

5

investigation by governmental agencies. Although Computer Associates had a prior business relationship with eMag, Leibenstern's reply informed Strickler that Computer Associates had already contacted Renew "on this for a related matter, but did not proceed." While Leibenstern wanted to speak with Strickler, he wrote that Computer Associates would also contact Renew. Strickler's supervisors, Sullivan and Gregor, were copied on Strickler's January 13, 2004 e-mail to Leibenstern and Leibenstern's same-day response.

A bidding war for the Computer Associates project ensued. Strickler handled all communication concerning eMag's bids to Computer Associates. Discussing the "strategy for Computer Associates" in an e-mail to Sullivan and Gregor, Strickler stated that he had been "subtly pointing out things we can offer CA that Renew Data cannot." After receiving an e-mail from Leibenstern containing Renew's bid, Strickler told his bosses at eMag that Renew was "playing dirty." In response, Sullivan sent an e-mail to Strickler with an attached spreadsheet "to play around with in case [eMag] need[ed] to re-bid." Ultimately, Computer Associates recommended eMag to PriceWaterhouseCoopers and PriceWaterhouseCoopers selected eMag as the vendor for the Computer Associates project. Strickler received between $2,000 and $3,000 as his commission for the project. While at eMag, Strickler also closed a deal with FTI, which had been a customer of eMag's and Renew's.

Renew sued Strickler on January 30, 2004, and filed an application for injunctive relief. Renew's second amended petition[1] asserted claims for breach of contract, tortious

---

[1] RenewData Corporation's second amended petition was the live pleading at trial.

interference with prospective business, and breach of fiduciary duty, for which Renew sought damages, a permanent injunction, costs, and attorney's fees. On February 3, 2004, the district court entered a temporary restraining order that prevented Strickler from making sales calls to Renew's customers, representing or using his employment or affiliation with Renew in any way, and disclosing any of Renew's proprietary information. A March 22, 2004 temporary injunction continued enforcement of these restrictions, but it was narrower in scope than that requested by Renew because it did not prevent Strickler from continuing to work for eMag in violation of his covenant not to compete.

Renew filed an accelerated appeal to this Court on March 19, 2004,[2] and requested oral argument. Thereafter, it sought two extensions that postponed the filing of its brief until June 10, 2004, a date it had requested. On September 9, 2004, the case was set for oral argument on December 15, 2004. Renew voluntarily dismissed its appeal on December 7, 2004.

Meanwhile, on November 8, 2004, Renew filed a motion in the district court seeking an equitable extension of the covenant-not-to-compete period. Strickler filed a motion to dissolve the temporary injunction. On November 29, 2004, the district court denied Strickler's motion to dissolve the temporary injunction and Renew's motion to extend the covenant-not-to-compete period beyond its original one-year term.

Trial began on January 24, 2005. At the close of Renew's evidence, the district court partially granted Strickler's motion for directed verdict based on its determination that the covenant

_____

[2] Renew's notice of appeal references a March 1, 2004 temporary injunction order that does not appear in the record. The court's March 22, 2004 temporary injunction order is in the record.

7

not to compete was unenforceable. At the conclusion of the trial, the jury found that Strickler (I) failed to comply with his agreement not to disclose Renew's proprietary information, (ii) failed to comply with his agreement to return Renew's company documents, (iii) tortiously interfered with Renew's prospective business relationship with Computer Associates, and (iv) failed to comply with his post-termination fiduciary duty to Renew. The jury awarded $2,500—Strickler's commission on the Computer Associates project—to Renew on its claims for tortious interference and breach of fiduciary duty. The jury did not award any amount on Renew's breach of contract claims. On April 7, 2005, the district court entered a judgment that awarded Renew $2,500 in actual damages, $1 as nominal damages for its breach of contract claims, plus costs, attorney's fees and a permanent injunction preventing Strickler's disclosure of Renew's proprietary information.

Renew filed its appeal of the judgment on May 9, 2005, and Strickler filed his cross-appeal on May 23, 2005. Renew sought an extension to file its brief on July 8, 2005, and on August 30, 2005, for its consolidated reply brief. On October 6, 2005, the case was set for argument on November 16, 2005. On October 11, 2005, Renew requested that oral argument be rescheduled until February 2006. Alternatively, Renew requested a ruling by submission on briefs. The matter was submitted on briefs on November 16, 2005.

On appeal, Renew argues that the district court erred by refusing to equitably extend the covenant-not-to-compete period beyond its original one-year term and by partially granting Strickler's motion for directed verdict on the unenforceability of the covenant not to compete. Strickler's cross-appeal contends that the district court erred by (I) denying a directed verdict on Renew's breach of contract, tortious interference with prospective business relationship, and breach

8

of fiduciary duty claims, (ii) entering an overly broad and vague permanent injunction, (iii) awarding attorney's fees and costs to Renew, and (iv) awarding nominal damages to Renew on its breach of contract claims.

## ANALYSIS

**Equitable Extension of Strickler's Covenant Not to Compete**

In its first issue, Renew argues that the district court erred by refusing to equitably extend the covenant-not-to-compete period beyond its original one-year term. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003) (district court empowered to craft injunction extending beyond expiration of non-solicitation covenant in light of court's year-long delay in deciding motion to reconsider). The court's exercise of its equitable powers is discretionary, and a party seeking equitable relief must "do equity." *Johnson v. Cherry*, 726 S.W.2d 4, 8 & n.2 (Tex. 1987). Thus, if Renew was itself responsible for the delayed enforcement of the covenant not to compete, the district court may properly deny the equitable relief requested. *See State Farm Life Ins. Co. v. Martinez*, 174 S.W.3d 772, 788 (Tex. App.—Waco 2005, pet. filed) (court did not abuse its discretion in denying claimant's interpleader because claimant created predicament). Renew contends that it has diligently pursued its remedies under the covenant not to compete and that it should not be penalized for delays inherent to litigation.

Strickler's covenant not to compete began running on the date of his termination, November 14, 2003. By December 31, 2003, when Renew's counsel wrote to Strickler advising him not to violate the covenant not to compete, Renew was aware that Strickler had accepted a

position with eMag and expected to begin work on January 2. Renew did not file suit against Strickler until January 30, 2004.

Renew complains that it filed an accelerated appeal to this Court on March 19, 2004, but it was not set for oral argument until December 15, 2004. Renew does not acknowledge that it sought two extensions from this Court to postpone the filing of its brief until June 10, 2004. Renew voluntarily dismissed its appeal on December 7, 2004.

Moreover, the district court's March 22 temporary injunction order included a trial setting of October 11, 2004, which would have preceded the expiration of the covenant not to compete. Strickler asserts, and Renew does not dispute, that Renew sought two continuances of the trial. The court granted Renew's first motion for continuance, which postponed the trial until January 24, 2005, and denied the second motion. Then, on November 8, 2004, Renew filed a motion with the district court seeking an equitable extension of the covenant-not-to-compete period, which was to expire in six days.

This chronology shows that the delays in the enforcement of the covenant not to compete were not simply "inherent to litigation" but were attributable to Renew. We find that Renew did not diligently pursue its remedies under the covenant not to compete and that the district court, in the exercise of its equity jurisdiction, did not abuse its discretion in denying Renew's motion for equitable extension of the covenant not to compete. We overrule Renew's first issue.

**Directed Verdict on Unenforceability of Covenant Not to Compete**

Renew's second issue urges that the district court erred by partially granting Strickler's motion for directed verdict on the unenforceability of the covenant not to compete.

10

Renew seeks injunctive relief prohibiting Strickler from working for one of Renew's competitors, including eMag, for 10½ months—the remainder of his year-long covenant not to compete. Strickler's contractual obligation not to compete has expired, and we have determined that Renew did not diligently pursue an equitable extension of the covenant not to compete. Thus, Renew cannot obtain the injunctive relief it seeks, and the question of the covenant's enforceability under section 15.50 of the business and commerce code is moot. *See* Tex. Bus. & Com. Code Ann. § 15.50 (West 2002); *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 643 (Tex. 1994); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 661 (Tex. App.—Dallas 1992, no writ) (after expiration of former employee's contractual obligation not to compete, employer's abandonment of its claim for injunctive relief mooted controversy). Accordingly, we overrule Renew's second issue.

**Denial of Directed Verdict on Renew's Remaining Claims**

In four of his issues on cross-appeal,[3] Strickler argues that the district court erred by denying his directed verdict on Renew's remaining claims because there is not legally or factually sufficient evidence to support the jury's findings that Strickler (I) breached his contract by disclosing Renew's proprietary information and failing to return Renew's company documents, (ii) tortiously interfered with Renew's prospective business relationship with Computer Associates, and (iii) breached his fiduciary duty to Renew after his termination. As a preliminary matter, we note that Strickler failed to file a motion for new trial; thus, his factual sufficiency challenges are waived. Tex. R. Civ. P. 324(b)(2); *Garza v. Garcia*, 137 S.W.3d 36, 38 (Tex. 2004).

---

[3] In his first and second issues, Strickler restated and responded to Renew's two appellate issues. Strickler's seven issues on cross-appeal are numbered three through nine.

11

In a review for legal sufficiency, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We must assume that jurors decided all questions of witness credibility in favor of the verdict if reasonable jurors could do so. *Id*. at 819. We will sustain a no-evidence issue when (I) the record discloses a complete absence of evidence of a vital fact, (ii) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (iii) the evidence offered to prove a vital fact is no more than a mere scintilla, or (iv) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003).

**Strickler's disclosure of proprietary information**

In accordance with the first paragraph of the Agreement, Strickler promised not to disclose Renew's proprietary information:

1. Recognition of Company's Rights; Nondisclosure. At all times during the term of my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing.

   . . . .

   The term "Proprietary Information" shall mean trade secrets, confidential knowledge, data or any other proprietary information of the Company. By way of illustration but not limitation, "Proprietary Information" includes (a) inventions, trade secrets, ideas, processes, formulas, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques (hereinafter collectively referred to as "Inventions"); and (b)

12

> information regarding plans for research, development, new products and services, marketing, and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; and information regarding the skills and compensation of other employees of the Company.

Strickler urges that there is not any evidence that he disclosed Renew's proprietary information.

The evidence reveals that on Strickler's first day at Renew and after signing the Agreement, he began his training on the process of the electronic evidence business, received the pipeline of prospective customers, and obtained a password to access SalesForce.com. Strickler agreed that it was important to access Renew's records in order to do his job managing and closing on all leads. He further agreed that the pipeline document and the information on SalesForce.com was not the kind of information that Renew would want to share with its competitors because Renew would not want to give its potential customer list away. He testified that if competitors had this information and had not already talked to Renew's customer or potential customer, the competitors would know that the customer was in need of services and could use it to contact the customer. Additionally, Strickler testified that before working at Renew he had signed nondisclosure agreements three times.

On the evening of Strickler's termination, Dan Junk, Strickler's co-worker—who would subsequently handle the bidding for Renew on the Computer Associates project—testified that Strickler called him. Strickler admits placing this call to Junk, but he disputes Junk's account of the content of their conversation. During their conversation, according to Junk's testimony, Strickler stated that he had been "laid off." After Junk expressed his concern for Strickler's family, Junk testified that Strickler said he "was certain that our competitors such as our friends at eMag

13

would be real interested in his knowledge of our business and our technology" and that he "wouldn't have any problem finding a job."

There is evidence that Strickler's first e-mail to Sullivan at eMag identified Strickler as Renew's former director of corporate sales, mentioned Renew's earlier meeting with eMag to discuss complementing and competing technologies, and requested a meeting "to determine if eMag could benefit from [his] knowledge and skills." The evidence further shows that Strickler was allowed to create his title, negotiate his contract terms, and secure employment at eMag without executing their standard confidentiality, noncompetition, and nondisclosure agreement and without any reference checks. Before starting his new job, Strickler told eMag that he could bring in $1 million of business during his first year. Gregor's e-mail response informed Strickler that there was not any cap on his earning potential and emphasized that eMag's goal was for Strickler "to bring in NEW business." Gregor asked Strickler to briefly document his goals and "who the immediate easy money targets are." But Gregor testified that he did not do anything specifically to make sure that Strickler was not contacting customers who had been Renew's customers.

The evidence also included Strickler's e-mail to Sullivan and Gregor, which states that in his quest to positively position eMag he has been "subtly pointing out" to Computer Associates "things that [eMag] can offer CA that Renew Data cannot." Sullivan testified that he could not be certain that while Strickler was pushing eMag's strengths, Strickler was not also sharing Renew's information. Sullivan further testified that Strickler "didn't elaborate" about what particular information he was sharing. Strickler testified that he had knowledge of Renew's pricing information for projects "of this type" and that he considered it confidential. Strickler's e-mail to

14

Sullivan and Gregor, after learning about Renew's low bid, demonstrates that Strickler knew enough about Renew's pricing to characterize its bid as "playing dirty." In response to that e-mail, Sullivan sent a spreadsheet by e-mail to Strickler "to play around with in case [eMag] need[ed] to re-bid." Furthermore, in an e-mail to Leibenstern, Strickler states that he "just left a meeting discussing pricing adjustments" and extends a new per-tape price to Computer Associates for extraction and storage of the data. Based on his experience with Strickler in negotiating this deal, Leibenstern testified that he would be surprised to learn that Strickler said he was never involved in preparing the pricing offered to Computer Associates. Ultimately, Computer Associates recommended eMag to PriceWaterhouseCoopers and PriceWaterhouseCoopers selected eMag as the vendor for the Computer Associates project.

These are not the type of circumstances that "give rise to any number of inferences, with none more probable than another." *Pitzner*, 106 S.W.3d at 729. Our review of the evidence shows that there was more than a scintilla of evidence that reasonable jurors could credit in support of their finding that Strickler disclosed Renew's proprietary information.

### Strickler's return of Renew's company documents

In accordance with paragraph ten of the Agreement, Strickler promised that when he left Renew's employ, he would return Renew's documents containing proprietary information:

10. <u>Return of Company Documents</u>. When I leave the employ of the Company, I will deliver to the Company all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information, or Proprietary Information of the Company. I further agree that any property situated on the Company's premises and owned by the Company,

including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company by executing the Company's termination statements for technical, management or executive personnel.

Strickler asserts that he did not realize he had company documents in his possession when he was terminated, that Jason Velasco did not ask him to return any documents when Velasco terminated him, and that he had company documents on his home computer because Bonnie Rodden, Gomes's wife, sent a "Fortune 1000 list" to him by e-mail.

Strickler's arguments are not persuasive. The essential elements of a breach of contract claim are that a valid contract existed, the plaintiff performed, the defendant breached, and the plaintiff has suffered resulting damages. *Frazin v. Hanley*, 130 S.W.3d 373, 376 (Tex. App.—Dallas 2004, no pet.). Strickler received access to Renew's confidential and proprietary information on his first day of work. Strickler promised that when he left Renew's employ, he would return all documents containing the company's proprietary information. "Proprietary information," as defined in the first paragraph of the Agreement, includes information regarding customers. The jury found that Strickler failed to comply with his agreement to return Renew's company documents. Strickler's breach of the Agreement is not excused because he did not realize that he had them in his possession when he was terminated.

Additionally, the Agreement does not require Renew to demand its documents before Strickler is obligated to return them. Whether Velasco specifically asked Strickler to return company documents does not affect Strickler's promise to return them when he left Renew's employment. Furthermore, the final page of the document that Strickler calls a Fortune 1000 list bears the

16

notations "Opportunity Pipeline," and "Copyright (c) 2000-2003 SalesForce.com, Inc. All rights reserved." The lines below that state "Generated By: Bonnie Rodden 6/6/2003 12:41PM" and "Renew Data." Strickler did not search his e-mail until he responded to requests for production. Strickler's failure to deliver this document to Renew until it was requested in the discovery phase of litigation supports the jury's finding that Strickler failed to return Renew's company documents in accordance with his Agreement.

### *Strickler's tortious interference with prospective business relationship*

To establish a claim for tortious interference with prospective business relationship, a plaintiff must prove (I) a reasonable probability that the plaintiff would have entered into a business relationship, (ii) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring, (iii) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct, and (iv) the plaintiff suffered actual harm or damage as a result of the defendant's interference. *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Strickler argues that there is not any reasonable probability that Computer Associates and Renew would have entered into a contractual relationship because Renew had never done business with Computer Associates, Renew was not capable of doing the work in a timely manner, and Computer Associates was not responsible for the selection of the vendor on the project. But Leibenstern's e-mail to Strickler stated that the chief information officer of Computer Associates had a relationship with Renew, Renew had already been contacted regarding another aspect of the

17

project, and even though Computer Associates did not proceed with Renew previously, Renew would be contacted again. Leibenstern testified that until he received Strickler's e-mail, he had never heard of Strickler or eMag, but he had heard of Renew. The evidence showed that Computer Associates received bids and handled negotiations for the project. Moreover, Leibenstern and Strickler testified that, although PriceWaterhouseCoopers would select the vendor for the project, Computer Associates was responsible for making a vendor recommendation to PriceWaterhouseCoopers. Gomes also testified that when Renew has provided a proposal and the customer actually purchased electronic discovery services, customers chose another vendor only 10-15% of the time. Thus, there was a reasonable probability that Computer Associates and Renew would have entered into a contractual relationship.

Strickler also argues that there is not any proof that he committed an independently tortious act "that borders on criminal conduct." This misstates the legal standard for "independently tortious" conduct. *See Wal-Mart Stores v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). The Court in *Sturges* articulated the standard:

> [I]n most Texas cases in which plaintiffs have actually recovered damages for tortious interference with prospective business relations, the defendants' conduct was either independently tortious . . . or in violation of state law. . . . We therefore hold that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful. By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.

*Id*. Strickler's breach of fiduciary duty is an independent tort that satisfies the *Sturges* prerequisites for a claim of tortious interference with prospective business relationship. *See Bright v. Addision*,

18

171 S.W.3d 588, 599 (Tex. App.—Dallas 2005, pet. filed) (lawyer's breach of fiduciary duty to client and fraud supported finding of interference with prospective business relationship). As noted in our discussion of fiduciary duty below, there is evidence that reasonable jurors could have credited in support of Renew's claim for breach of fiduciary duty.

Strickler further disputes the existence of evidence that he acted with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct. Yet Strickler initiated the contact with Computer Associates by his e-mail to Leibenstern. Strickler informed Leibenstern that "he was in this to compete," and to "win the business." The jury saw Strickler's e-mail telling Sullivan and Gregor that he has been "pointing out" eMag's distinctions to "positively position" them with Computer Associates. Strickler knew about Renew's pricing information for "this type of project" and that it was confidential. Sullivan was not certain Strickler was protecting Renew's confidential information and Strickler "didn't elaborate" about the information that he shared. Gregor did not do anything to ensure that Strickler was not contacting those who had been Renew's customers. When Strickler sent the "Renew's playing dirty" e-mail, Sullivan replied with a spreadsheet for Strickler's use on a re-bid. Strickler informed Leibenstern that he could offer a new price, having just left a pricing adjustments meeting. Furthermore, Strickler's conduct during the negotiation process led Leibenstern to believe that Strickler was involved in preparing the pricing for the project.

This evidence shows that Strickler acted with a conscious desire to prevent a business relationship between Computer Associates and Renew from occurring or that Strickler knew that the interference was certain or substantially certain to occur as a result of his conduct. While Strickler

19

also contends that there was not any evidence to support the jury's $2,500 damage award to Renew on its tortious interference claim, Sullivan testified that Strickler's commission on the Computer Associates project would have been 18% of whatever the gross margin was—"maybe $2,000 or $3,000."

Our review of the record shows that there was evidence that a reasonable jury could credit in support of its finding that Strickler tortiously interfered with Renew's prospective business relationship with Computer Associates.

### Strickler's breach of fiduciary duty

Strickler contends that his fiduciary relationship while he was employed with Renew does not preclude him from making preparations for a future competing business venture and that an at-will employee may take active steps to do so while still employed. *See Bray v. Squires*, 702 S.W.2d 266, 270 (Tex. App.—Houston [1st Dist.] 1985, no writ). He argues that once an employee resigns, in the absence of a noncompetition agreement, the employee may actively compete with a former employer. *See Augat, Inc. v. Aegis, Inc.*, 565 N.E. 2d 415, 419 (1991) (quoted in *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)). Strickler further argues that if there is a noncompetition agreement, an action for breach of fiduciary duty is preempted by the covenants not to compete act. *See* Tex. Bus. & Com. Code Ann. § 15.52 (West 2002).

Renew responds that a fiduciary relationship of agency exists between an employee and his employer. *Brewer & Pritchard, P.C.*, 73 S.W.3d at 200. Among the agent's fiduciary duties to the principal include the duty to not to act as, or on account of, an adverse party without the principal's consent, the duty not to compete with the principal on his own account or for another in

20

matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them. *Id.* The employee's obligation not to use confidential or proprietary information acquired during the relationship in a manner adverse to the employer survives the termination of employment. *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ).

Renew also contends that a former employee's unauthorized use of confidential and proprietary information for his own benefit and to his former employer's detriment is distinct from simply competing with a former employer. *See Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ). Renew notes that a claim based on such use of an employer's information is not governed or preempted by the covenants not to compete act. *See* Tex. Bus. & Com. Code Ann. § 15.52. In *Rugen*, the court clarified this distinction, stating that

> [a]s a general rule, in the absence of an enforceable agreement not to compete, an employer is not entitled to an injunction preventing a former employee from soliciting the employer's clients. But it is well established that even without an enforceable contractual restriction "a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment."

*Rugen*, 864 S.W.2d at 551 (citations omitted).

Strickler urges that there is not any evidence that he disclosed information received during his employment at Renew to any third party, Computer Associates was not considered a prospective customer during his employment at Renew, the definition of proprietary information in his Agreement does not include Renew's prospective customers, he was only a conduit for pricing

21

information on the Computer Associates project, and the jury's $2,500 damage award on the breach of fiduciary duty claim is not supported by any evidence.

Nevertheless, there was evidence supporting the jury's finding that Strickler breached his post-termination fiduciary duty to Renew. It included Strickler's assertion about being a competitor and wanting to learn how to win Computer Associates's business, his statement that he was distinguishing eMag to Computer Associates by pointing out Renew's shortcomings, his knowledge of Renew's confidential pricing information, his description of his former employer's bid as "playing dirty," his receipt of a spreadsheet for use on a re-bid against Renew, and his presentation of a new price to Leibenstern following a "price adjustments meeting." Additionally, Strickler's new employer was not certain that Strickler was protecting Renew's confidential information or that he was refraining from contacting those who had been Renew's customers. If Strickler said he was never involved in price preparation for the project, Leibenstern said he would be surprised. Gomes also testified that Computer Associates was a prospective customer of Renew's. Strickler's argument that the Agreement does not specifically identify information about prospective customers in its definition of proprietary information does not address Renew's argument that the definition was not all-inclusive, as signaled by the prefatory phrase "[b]y way of illustration but not limitation."

There was also evidence that, during a conversation with Junk on the evening he was terminated, Strickler said he "was certain that our competitors such as our friends at eMag would be real interested in his knowledge of our business and our technology" and that he "wouldn't have any problem finding a job." Junk further testified that, when he brought up the covenant not to compete, Strickler told him "he had never seen a covenant not to compete worth the paper it was written on."

22

Junk also testified that Strickler "was very negative about Bob [Gomes] and one of the other founders, Jason Velasco" and that Strickler seemed to be dissuading Junk from working at Renew. Junk's impression is supported by Strickler's testimony that he told Junk "RenewData [wa]s the Bob and Bonnie show" because Junk was considering relocating his family to Texas. Junk thought Strickler was upset about being let go and was "just talking" and "venting."

The evidence also shows that when Strickler sent his first e-mail to Sullivan, he identified himself as Renew's former director of corporate sales, mentioned Renew's earlier meeting with eMag to discuss complementing and competing technologies, and requested a meeting "to determine if eMag could benefit from [his] knowledge and skills." Sullivan testified that he had never met or talked to Strickler before receiving his e-mail. But the record shows that Strickler was allowed to create his title, negotiate his contract terms, and secure employment at eMag without executing their standard confidentiality, noncompetition, and nondisclosure agreement and without any reference checks. The jury also heard Sullivan's testimony that Strickler's commission on the Computer Associates project would have been 18% of whatever the gross margin was—"maybe $2,000 or $3,000." Reasonable jurors could have credited this evidence in support of Renew's claim for breach of fiduciary duty.

Based on the foregoing discussion of Strickler's legal sufficiency challenges, we overrule Strickler's third, fourth, seventh, and eighth issues.

**Entry of Permanent Injunction and Awards of Attorney's Fees and Nominal Damages**

In his three remaining issues, Strickler argues that the district court abused its discretion by (i) by entering an overly broad and vague permanent injunction, (ii) awarding attorney's

23

fees to Renew, and (iii) awarding nominal damages to Renew on its contract claims. Although Strickler included the issue of the court's award of costs as part of his sixth point of error on attorney's fees, we do not address the issue because he did not raise this complaint with the district court and because his brief did not provide any argument on it. *See* Tex. R. App. P. 33.1; 38.1(h).

The grant of a permanent injunction is ordinarily within the trial court's sound discretion and is reviewed for an abuse of that discretion. *Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 667 (Tex. App.—Austin 2005, no pet.); *Texas Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 851 (Tex. App.—Austin 2002, pet. denied). Similarly, we review a judge's decision to award attorney's fees for an abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). The abuse of discretion standard also applies to a court's award of costs. *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 376 (Tex. 2001). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002).

### *Entry of permanent injunction*

Strickler argues that the district court abused its discretion by entering a permanent injunction that is overly broad because it does not define what is meant by Renew's "customers." *See Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 221-22 (Tex. App.—Dallas 2005, no pet.). Strickler also asserts that Renew's evidence was legally insufficient to support injunctive relief because it did not establish any wrongful act, imminent harm, irreparable

24

injury, and the absence of an adequate legal remedy. *See Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 432 (Tex. App.—Austin 2004, pet. denied).

Renew argues that the injunction is proper to protect confidential information and trade secrets and to prohibit Strickler's use of confidential information to solicit Renew's clients. *See Rugen*, 864 S.W.2d at 551; *see also Simplified Telesys, Inc. v. Live Oak Telecom*, 68 S.W.3d 688, 692-93 (Tex. App.—Austin 2000, pet. denied). Renew also argues that nondisclosure agreements are not against public policy because they do not restrain trade and do not prohibit the employee from using the general knowledge, skill, and expertise acquired in former employment. *Zep Mfg. Co.*, 824 S.W.2d at 663. Renew further argues that nondisclosure agreements may be enforced even when covenants not to compete are not, *see Tom James of Dallas, Inc. v Cobb*, 109 S.W.3d 877, 888 (Tex. App.—Dallas 2003, no pet.); *Zep Mfg. Co.*, 824 S.W.2d at 662-63, and because such agreements do not restrain trade, they need not contain temporal, geographical, and scope-of-activity limitations to be enforceable. *See Zep Mfg. Co.*, 824 S.W.2d at 663.

The relevant portion of the judgment states:

> [T]he Court finds that plaintiff will suffer irreparable injury in the form of lost customers and business, and damage to its goodwill and reputation, if defendant discloses RenewData's confidential and proprietary information to third parties, including RenewData's competitor eMag Solutions. Because of the uncertain nature of these damages, plaintiff has no adequate remedy at law.
>
> It is therefore ordered, adjudged and decreed that the defendant, Shawn Strickler, shall be permanently enjoined from disclosing to eMag Solutions, or any other persons, trade secrets, confidential knowledge, or any other proprietary information of RenewData Corporation, including RenewData's inventions, trade secrets, ideas, processes, formulas, data, programs, discoveries, developments, designs and techniques, information regarding plans for research and development, new products and services[,] marketing a[n]d selling, business plans, budgets and financial statements, licenses, prices and costs, and the *identities of* suppliers and customers.

25

(Emphasis added.)

Renew provided Strickler with training on the process of its electronic evidence business, its pipeline of prospective customers, and password access to SalesForce.com. Strickler acknowledged that this information was important to the performance of his job. He also testified that it was not the kind of information Renew would want to share with its competitors because "Renew would not want to give its potential customer list away." Evidence of Renew's customer information was admitted at trial pursuant to an agreed protective order between Strickler and Renew.

The judgment enjoins Strickler from disclosing the identities of Renew's customers to eMag or other persons. It does not incorporate any other document by reference, it is not written in terms of permissible conduct instead of prohibited conduct, it does not prohibit "canvassing or soliciting" any business, nor does it prohibit disclosure of information that does not belong to Renew. In these respects, it differs from the permanent injunction in *Computek*, which incorporated a separate document listing businesses that were not encompassed by the injunction, prevented Computek from asking contacts whether they were clients of the former employer during the relevant times, and extended protection to information that was unrelated to the former employer's business. *See Computek*, 156 S.W.3d at 221 n.1, 222-23.

Contrary to Strickler's assertion that his behavior was merely "healthy competition," there is sufficient evidence of a wrongful act, as previously discussed. The record includes evidence of Strickler's:

- plan to share his knowledge of Renew's business and technology with eMag,

26

- failure to return a document belonging to Renew when he left Renew's employment,

- e-mail to DTI, his client while at Renew, encouraging a call to assist with its "opportunities,"

- "subtly pointing out" to Computer Associates things eMag could offer that Renew could not,

- lack of elaboration to eMag about what particular information he was sharing,

- authorization "to play around with" a spreadsheet for eMag's re-bidding purposes,

- inclusion in a meeting on pricing adjustments to the Computer Associates project, and

- description of Renew's business conduct as "playing dirty."

The court also heard evidence of imminent harm from Strickler, who testified that if eMag could "hook" Computer Associates, it would be an "excellent catch" that would allow eMag to "tap Computer Associates['s] customer base by exploiting their sales force as a channel." Having hooked Computer Associates, Strickler may expect additional chances to disclose Renew's proprietary or confidential information in such future sales transactions. Strickler also testified to his familiarity with Renew's pricing information for projects "of this type."

Strickler's contentions that Renew failed to establish an irreparable injury and absence of an adequate legal remedy are not persuasive. An injury is irreparable if the injured party cannot be adequately compensated in damages or if damages cannot be measured by any certain pecuniary standard. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002). Damages alone do not provide an adequate remedy when they are difficult to calculate because of the nature of the applicant's loss. *TCA Bldg. Co. v. Northwestern Res. Co.*, 890 S.W.2d 175, 179 (Tex. App.—Waco

27

1994, no writ). Gomes testified that the loss of the Computer Associates project was significant to Renew because Renew lost the opportunity to expand its services within that project or "engagement" and lost the benefit of repeat business. Gomes testified that Renew has not received any business from Computer Associates. Gomes also testified that, because the bidding process for such projects is not always transparent, Renew may not be aware of additional business losses incurred on projects in which Strickler may have shared Renew's proprietary or confidential information to benefit eMag.

Renew argues that the loss of the Computer Associates project—and the repeat business expected to follow from it—involves damage to its business that is difficult to calculate and for which a monetary award would be insufficient. Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury. *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ). Furthermore, because of the nature of Renew's injury, its recovery of damages alone would be inadequate. *TCA Bldg. Co.*, 890 S.W.2d at 179.

Based on the evidence presented to the district court, we conclude that it did not clearly abuse its discretion in granting the permanent injunction.

### Award of attorney's fees to Renew

Strickler also argues that the district court abused its discretion by awarding attorney's fees to Renew because the jury did not award any damages on Renew's contract claims, nominal damages will not support an award of attorney's fees, Renew's pleadings do not support the recovery

of fees, and Renew did not comply with the presentment requirement in section 38.002 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (West 1997).

A prevailing party may recover attorney's fees from the opposing party only if the recovery of fees is provided for by statute or contract. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). A person may recover reasonable attorney's fees, "in addition to" the amount of a valid claim and costs, if the claim is for an oral or written contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1997). To obtain an award of attorney's fees a party must (i) prevail on a cause of action for which attorney's fees are recoverable and (ii) recover damages. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384 (Tex. 1997); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 796 (Tex. App.—Houston [1st Dist.] 2001, no pet.). There must be a recovery of money—or at least something of value—otherwise the attorney's fee award cannot be described as an addition to the claimant's relief. *Butler*, 51 S.W.3d at 797; *Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 551 (Tex. App.—Dallas 1991, no writ). A court's award of injunctive relief, even without recovery of monetary damages, justifies an award of attorney's fees because it is "something of value" that the party recovered for its contractual claim. *Butler*, 51 S.W.3d at 797 (citing *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 474 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also Southwestern Bell Mobile Sys. v. Franco*, 971 S.W.2d 52, 56 (Tex. 1998) (upholding award of attorney's fees based on court's judgment awarding plaintiff equitable relief of reinstatement to employment).

In this case, Renew prevailed on all the jury questions in the court's charge. Renew did not obtain money damages on the jury's affirmative findings of Strickler's failure to comply with his agreement not to disclose Renew's proprietary information and his failure to comply with his

29

agreement to return Renew's company documents. But Renew showed that a permanent injunction was necessary to prevent Strickler's further contractual violations of his nondisclosure agreement and to protect the goodwill of Renew's business. As in *Butler*, the permanent injunction has value because it prevents Strickler from using confidential knowledge he acquired while working at Renew to disadvantage Renew and positively position eMag in future business transactions. *See Butler*, 51 S.W.3d at 797. Here, Renew's attorney's fees would be "in addition to" Renew's injunctive relief. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8).

Strickler's next argument is that Renew has waived its claim for attorney's fees because its pleadings do not state that its claim for attorney's fees is based on its award of injunctive relief; Renew's petition only seeks attorney's fees under section 38.001 of the civil practice and remedies code, for breach of contract. *See id.* § 38.001; *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) (judgment must be supported by pleadings); *Murray v. O&A Express, Inc.*, 630 S.W.2d 633, 636-37 (Tex. 1982) (same). But Strickler's failure to (I) comply with his agreement not to disclose Renew's proprietary information and (ii) comply with his agreement to return Renew's company documents were violations of the nondisclosure provisions in the parties' Agreement—breaches of contract. Renew did not waive its claim for attorney's fees under section 38.001 because that section expressly permits a recovery of attorney's fees for breach of contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8).

Strickler also argues that Renew failed to present its claim under section 38.002 of the civil practice and remedies code. *See id.* § 38.002. To recover attorney's fees on a breach of contract claim, the claimant must "present the claim to the opposing party or a duly authorized agent of the opposing party" so that the opposing party has an opportunity to pay or tender performance

30

without incurring attorney's fees. *Id.*; *France v. American Indem. Co.*, 648 S.W.2d 283, 285-86 (Tex. 1983) (citing *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1983)); *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 269 (Tex. App.—Austin 2002, no pet.). No particular form of presentment is required—it may be informal or even oral. *Erdeljac*, 94 S.W.3d at 269 (citing *Kelley*, 614 S.W.2d at 100).

Renew met its presentment requirement when its counsel, M.C. Arendas, sent a letter to Strickler on December 31, 2003, seeking Strickler's performance under the Agreement. Arendas followed this letter with a January 9, 2004 letter to Strickler's counsel at the time. These letters remind Strickler and inform his counsel of Strickler's promises in the Agreement not to compete with Renew and to hold Renew's proprietary and confidential information in the strictest confidence. Strickler's argument that Renew failed to present its claim under section 38.002 of the civil practice and remedies code is without merit.

### Nominal damages award

Strickler's next argument is that the district court abused its discretion by awarding nominal damages to Renew because it constituted an improper additur. *See Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 325 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *Ponce v. Sandoval*, 68 S.W.3d 799, 805 (Tex. App.—Amarillo 2001, no pet.) (civil procedure rules do not provide for additur by court to increase amount of damages jury found). Renew argues that the court did not order an "additur" but awarded nominal damages of $1 to Renew, as requested in its motion for judgment, for its successful breach of contract claim.

When a plaintiff fails to prove actual damages resulting from a breach of contract, nominal damages are available upon proof of a contract and a breach thereof. *Centre Equities, Inc. v. Tingley*, 106 S.W.3d 143, 154 n.7 (Tex. App.—Austin 2003, no pet.). A party may not recover nominal damages unless it requests a special issue or moves for judgment in the trial court for such damages. *Broady v. Johnson*, 763 S.W.2d 832, 835-36 (Tex. App.—Texarkana 1988, no writ).

Strickler asserts that nominal damages may be used as a vehicle to tax costs but may not support an award of attorney's fees to Renew. *See ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 257 (Tex. App.—Dallas 1990, no writ). As noted in the previous section, Renew is entitled to attorney's fees, independent of any nominal damage award, based on its award of injunctive relief. *See Butler*, 51 S.W.3d at 797; *see also Franco*, 971 S.W.2d at 56. Because any harm that the $1 award imposes on Strickler for the breach of contract claims is *de minimis*, we conclude this issue does not merit reversal of the judgment.

Based on the foregoing discussion, we overrule Strickler's ninth, fifth, and sixth issues.

## CONCLUSION

We conclude that (I) Renew failed to exercise due diligence in pursuing enforcement of the covenant-not-to-compete period before its expiration, (ii) the question of the enforceability of the covenant not to compete is moot, (iii) the district court did not err by denying the remainder of Strickler's motion for directed verdict, entering the permanent injunction, and awarding attorney's fees to Renew, and (iv) any error in the court's award of $1 to Renew for its breach of contract

claims is *de minimis* and does not warrant reversal.  Accordingly, we affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   March 3, 2006